2022 IL App (1st) 210940-U

FIFTH DIVISION
June 30, 2022

No. 1-21-0940

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| JOHN NERSESIAN, individually and derivatively on behalf of NM ACQUISITIONS, LLC, an Illinois limited liability company, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17 CH 12353 |
| | ) | |
| MICHAEL MURDOCK, an individual | ) | |
| | ) | |
| (former) Defendant, | ) | |
| | ) | |
| and CHARLES MURDOCK, an individual, | ) | Honorable |
| | ) | Allen P. Walker, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Cunningham concurred in the judgment.

**ORDER**

*Held***:**  We affirm the circuit's court denial of the appellant's motion for sanctions, because the appellee made reasonable pre-complaint inquiries, and his claims were not so plainly meritless that he had a duty to voluntarily dismiss them upon learning particular information during the course of the litigation.

¶ 1     This case arises from a dispute between plaintiff-appellee John Nersesian, defendant-appellant Charles Murdock, and Charles's son and former defendant Michael Murdock, regarding a property transaction conducted by NM Acquisitions, LLC (NMA).[1] After Nersesian filed an initial complaint and two amended complaints, the circuit court granted partial summary judgment for Charles on one claim, and Nersesian then voluntarily dismissed his remaining claims. Charles filed a motion for sanctions against Nersesian pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018), which the court denied. Charles now appeals that order, arguing that sanctions were required because Nersesian failed to conduct proper pre-complaint inquiries, and also failed to timely dismiss his claims after discovery demonstrated their invalidity. We affirm.

¶ 2                                  BACKGROUND

¶ 3     On September 12, 2017, Nersesian filed his verified complaint against Michael, Charles, and Pacacory Properties, LLC, a/k/a Pacacory Properties LLC BC.[2] In relevant part, Nersesian alleged that in December 2014 and January 2015, Michael and Nersesian agreed to form NMA to purchase, renovate, and sell properties, including a property on the 4300 block of North Keeler Avenue in Chicago (Keeler Property). The two agreed that Michael would run the day-to-day business of NMA, including "filing tax returns, filing annual reports, and keeping NMA in good standing with the Illinois Secretary of State." Nersesian alleged that when NMA officially formed, its members were Nersesian and Pacacory Properties, LLC, but later Michael and Charles were listed as "members and/or managers." Nersesian attributed this to information from the Illinois Secretary of State, which he alleged conflicted with the "organizational documents of NMA."

---

[1] Because Michael Murdock and Charles Murdock share a last name, we will refer to them by their first names.

[2] Pacacory Properties LLC and Pacacory Properties LLC BC are separate entities, but Nersesian's Verified Complaint conflated them.

Nersesian initially contributed $240,000 to NMA. He and Michael agreed that when the entity earned money, Nersesian would first recoup his contribution, then Michael would recoup his, and the two would evenly split any remaining net proceeds.

¶ 4    On January 7, 2015, Michael purchased the Keeler Property in his name for $204,000. He oversaw renovations, and later conveyed the property to NMA by a quit claim deed dated April 14, 2016. When the property was sold months later, Charles "assisted" with the closing, and also "assisted in the recording of releases and satisfactions of judgment for the personal benefit of" Michael in connection with the closing. Due to these releases, NMA, and by extension Nersesian, received less profit than expected from the sale. Nersesian repeatedly asked Michael for an accounting, which Michael did not provide.

¶ 5    In March 2015, Michael proposed that NMA purchase property on the 4500 block of North Krueger Road in Long Grove, Illinois (Krueger Property). Nersesian agreed, and contributed $900,000 through the NMA bank account, which Michael controlled. NMA purchased the Krueger property in April 2015 for $725,000, but as of the date of the verified complaint, Michael had not completed renovations. Nersesian alleged that Michael abandoned the Krueger Property and refused to account for Nersesian's contribution.

¶ 6    Nersesian's claims against Charles alleged in pertinent part that Charles violated his fiduciary duties by representing NMA at the Keeler Property closing, during which seven "releases and satisfactions of judgment were recorded for the benefit of [Michael] personally," against NMA's and Nersesian's interests. Nersesian alleged that Charles prepared one of these releases himself, and further breached his fiduciary duties by "(1) failing to properly manage the legal affairs of NMA, (2) engaging in a representation where a conflict of interest existed without

3

obtaining a waiver of such conflict, and (3) putting his personal interest before and above those of NMA and Nersesian."

¶ 7    Nersesian attached documents to the verified complaint, including a document titled "corporate resolution," which bore Charles's signature as a "member" of NMA and provided that Charles could sign documents to execute the Keeler Property closing, and had an empty signature line for Nersesian; a copy of the warranty deed for NMA's sale of the Keeler Property, dated June 9, 2016, which also bore Charles's signature in his capacity as a "member" of NMA; and forms related to Michael's debts to various parties, including a release from Byline Bank, dated June 14, 2016, that contains a note stating, "prepared by [Charles]."

¶ 8    On November 27, 2017, Charles moved to dismiss the claims against him, arguing in relevant part that Nersesian failed to plead that Charles owed a fiduciary duty to Nersesian or NMA, or acted as NMA's attorney.

¶ 9    On January 4, 2018, before the circuit court ruled on the motion, Nersesian filed an amended verified complaint, wherein he alleged in relevant part that Charles was a "former" member of NMA, but acted as a member of NMA during the Keeler Property transaction, and breached his fiduciary duty while doing so. The amended verified complaint also referred to an annual report filed with the Secretary of State on April 13, 2016, which listed Charles and Nersesian as the NMA members, and articles of amendment, dated June 13, 2016, which added Michael as a member and again listed Charles as a member. Charles's signature appeared on both documents, which Nersesian attached to the filing. Additionally, Nersesian alleged that at the Keeler Property closing, Michael provided NMA's "closing attorney" with a "copy of a purported signed operating agreement for NMA," which listed Nersesian, Michael, and Charles as members. The signature on that document purporting to be Nersesian's was not his, and he did not authorize

4

anyone to sign on his behalf. At the Keeler Property closing, Charles "executed documents or, without proper authority, instructed NMA's closing attorney to execute documents providing for the payment of [Michael's] personal loans from the closing escrow and the escrowing of funds for title indemnities for personal liens and judgments of Michael." Nersesian further alleged that Charles was a signatory on NMA's bank account.

¶ 10    Nersesian attached to the amended verified complaint a document entitled "operating agreement," that listed Charles as an NMA member and purported to bear his signature, as well as an NMA annual report, filed September 11, 2017, which no longer listed Charles as a member or bore his signature.

¶ 11    On February 1, 2018, Charles moved to dismiss the amended verified complaint, arguing that it did not sufficiently allege facts showing Charles owed NMA a fiduciary duty, a breach of any alleged duty, or damages. On June 18, 2018, the circuit court granted Charles's motion without prejudice.

¶ 12    On July 16, 2018, Nersesian filed his second amended verified complaint, in which he alleged in relevant part that Charles acted as NMA's agent at all relevant times, and held himself out to be a member of NMA between January 8, 2015 and September 11, 2017. Nersesian alleged that Charles did so "for the purpose of improperly asserting control of NMA, to assist [Michael] in his tortious conduct, and to divert funds from the sale of the Keeler Property without" Nersesian's consent. Nersesian included new claims against Charles: Count V for breach of fiduciary duty by an agent, and Count VI for aiding and abetting breach of fiduciary duty.

¶ 13    Charles moved to dismiss Nersesian's second amended verified complaint, arguing that Nersesian failed to allege sufficient facts to support his new claims. Nersesian responded to Charles's motion, arguing his allegations established "the existence of an agency relationship"

between Charles and NMA. On January 24, 2019, the circuit court granted Charles's motion as to Count V only.

¶ 14    On December 17, 2018, Nersesian responded to Charles's request for admissions, and admitted that he never communicated with Charles, never received legal advice from Charles, and Charles was never an NMA member.

¶ 15    On February 21, 2019, Charles filed an answer in which he denied that he used the NMA bank account, signed the April 13, 2016 annual report or the articles of amendment, or assisted Michael in any allegedly tortious conduct. Charles also denied that he provided the operating agreement to Coleman. He admitted that at Coleman's direction, he "executed certain documents with the understanding that the immediate execution of those documents was required for the closing of a real estate transaction that would benefit both Nersesian and Michael."

¶ 16    On May 6, 2019, Coleman was deposed. She testified that she did not believe she ever spoke to Nersesian. She admitted that if NMA purchased the Keeler Property initially, instead of Michael, his personal liens would not have attached. By virtue of Michael's individual purchase, NMA could not sell the Keeler Property before clearing Michael's liens because they were clouds on the title. She confirmed that NMA's profits would have increased from the Keeler Property sale if not for the need to pay Michael's liens.

¶ 17    She further testified that she or someone at her office instructed Charles to sign the corporate resolution, a version of which, that also bore Nersesian's signature, is attached to her deposition. This version of the corporate resolution lists Nersesian and Charles as NMA members, authorizes Charles to enter into the contract for sale of the Keeler Property and to "execute any and all documents necessary to close the sale," and indicates it was prepared by Michael and Coleman. She directed closing documents to Charles for signature because to her "knowledge he

was the managing member (of NMA)." At no point between June 9, 2016 and the Keeler Property closing did Michael or Charles tell Coleman that Charles was not an NMA member.

¶ 18    On May 31, 2019, Michael responded to Nersesian's interrogatories, and explained that Pacacory Properties LLC BC, Michael's LLC under which he joined NMA, was a "Designated Series" of Pacacory Properties LLC, of which Charles was the sole member. When Michael attempted to file the articles of organization and annual report for NMA, the Illinois Secretary of State office erroneously refused to accept them, insisting Charles's LLC was the member LLC of NMA. In response, Michael "listed [Charles] as the [NMA] member." Michael admitted that Charles was a "back-up signatory" to the NMA bank account, but did not receive bank statements or ever access the account. Michael also acknowledged he signed Charles's and Nersesian's names to the operating agreement, and indicated he signed Charles's name to other documents due to the situation with the Secretary of State's office.

¶ 19    On July 17, 2019, Nersesian was deposed. He testified he believed Charles acted as an attorney for NMA when it purchased the Keeler Property based on documents he reviewed, but he could not recall which documents specifically. Michael also informed Nersesian verbally that Charles would be involved with the Keeler Property transaction. He did not request the Keeler Property closing documents from Michael before filing the lawsuit. Nersesian did not recall when he signed the corporate resolution, and whether it was before or after the Keeler Property sale. He acknowledged the resolution authorized Charles to enter into a contract for the sale of the Keeler Property. Nersesian could not recall what, if any, documents reflected Charles's involvement in the Krueger Property.

¶ 20    Nersesian confirmed his allegations against Charles were based on documents produced in discovery, and claimed "numerous documents" showed Charles's involvement, but could not

reference any document specifically. Before filing the lawsuit, Nersesian visited the Krueger Property and reviewed its tax records, and also unsuccessfully requested an accounting of the Keeler Property sale from Michael. Nersesian did not "directly" request any documents from the Illinois Secretary of State's office before filing the verified complaint. Nersesian could not recall if he ever approved Charles to become an NMA member. He based his allegation that Charles instructed Coleman to pay Michael's personal loans from the Keeler Property closing proceedings on "Charles's role in the partnership and the closing transaction that took place," and the closing documents "that indicate the payment of existing liens prior to the release of funds" to NMA, with which he believed Charles would be "very familiar."

¶ 21 On October 18, 2019, Charles moved for summary judgment, arguing that Nersesian presented no evidence that Charles knew of a violation by Michael. Respecting the Keeler Property, Charles argued the evidence showed any knowledge he had came directly from Coleman. Additionally, the corporate resolution showed Nersesian had authorized Charles's actions regarding the Keeler Property. Respecting the Krueger Property, Charles emphasized Nersesian testified at his deposition that he had no recollection of any involvement by Charles. He attached Nersesian's and Coleman's deposition transcripts, Nersesian's request for admissions response, and Michael's interrogatory responses to the motion, and other documents, to the motion.

¶ 22 On December 13, 2019, Nersesian moved for leave to file an amended Count V of the second amended verified complaint. The circuit court granted the motion over Charles's objection.

¶ 23 In Nersesian's response to the motion for summary judgment, he represented he only sought relief from Charles based on the Keeler Property transaction, and abandoned any claims against Charles regarding the Krueger Property. Nersesian contended that a genuine issue of material fact existed regarding "Charles' knowing assistance of Michael's breach of his fiduciary

duties to Nersesian" relating to the Keeler Property transaction. In his undisputed material facts sections, Nersesian admitted he signed the corporate resolution that permitted Charles to sign certain documents on NMA's behalf at the Keeler Property closing.

¶ 24    Michael and Nersesian settled their dispute on February 27, 2020.

¶ 25    On January 21, 2021, the circuit court granted summary judgment on count VI, finding "there is no genuine issue of material fact or evidence to make a showing that [Charles] knowingly and substantially assisted [Michael] in the diversion of the proceeds from the sale of the subject property or that [Charles] was regularly aware of [Michael's] alleged conduct." Nersesian then moved to dismiss his remaining claims, which the court granted on March 3, 2021.

¶ 26    On April 1, 2021, Charles moved for sanctions against Nersesian pursuant to Rule 137. In relevant part, he alleged that Nersesian did not make a reasonable pre-complaint inquiry into his claims. Specifically, Charles complained that Nersesian never contacted him or Coleman before filing the verified complaint. Charles further cited Nersesian's request for admission response that Charles was never a member of, or attorney for, NMA, and Nersesian's testimony that he was unclear of Charles's role at NMA, and could not identify the specific documents that formed the bases of his claims. Additionally, Charles argued that Nersesian never had a basis for the Krueger Property allegations, and improperly included those claims in each successive complaint.

¶ 27    Charles attached to the motion for sanctions an email from his attorney to Nersesian's attorney dated October 30, 2017 (between the verified complaint and amended verified complaint), wherein Charles's attorney represented that the Keeler Property closing documents showed Coleman, not Charles, was NMA's attorney at the closing. Charles's attorney requested that Nersesian dismiss Charles from the case because he "provided no legal services for your client or

[NMA], never has had managerial authority with respect to [NMA] or Pacacory Properties LLC BC, and has in no way facilitated the wrongs" alleged against Michael.

¶ 28    In Nersesian's response to the motion for sanctions, he emphasized that Charles's signature appeared on a number of "organizational documents, a corporate resolution, and closing documents for the Keeler Property," and that Michael's forgeries were not revealed until later in the discovery process. Nersesian continued that the circumstances of the Keeler Property closing suggested his claims against Charles could have validity, as Charles agreed to assist Michael by signing the Keeler Property closing documents even though Nersesian could sign on behalf of NMA and Charles knew he was not a member of the LLC, permitting the inference "that Charles must have been aware of an intent to conceal the details of the closing." Specific addressing his allegations in the verified complaint that Charles acted as NMA's attorney, Nersesian argued he relied on Michael's statements of Charles's likely involvement in NMA, the corporate resolution, and the fact Charles signed release of judgment documents for Michael's liens. Nersesian also argued he did attempt to contact Charles before filing suit, but Charles refused to attend a September 2017 meeting. Regarding the Krueger Property, Nersesian argued the NMA bank account records, with Charles as a signer on the account, justified the initial allegations.

¶ 29    At a hearing on the sanctions motion, Charles's attorney argued in pertinent part that Nersesian signed the authorization for Charles to "sign any documents necessary" to close the Keeler Property sale. He further argued that Charles's name only appeared on the documents submitted to the Secretary of State because of the Secretary of State office's error, and Michael's response thereto, a fact Charles could have told Nersesian before the any litigation had Nersesian simply contacted him. The attorney contended that Nersesian only brought claims against Charles "to assert pressure on Michael by having his father, an esteemed law professor, dragged into

litigation and have his name smeared" across three verified pleadings "despite the lack of evidence to substantiate" the claims. Charles's attorney maintained that Nersesian's conduct remained sanctionable despite his ultimate dismissal of the case because Nersesian put Charles "through the expense of proving that [the] aiding and abetting theory also held no water, even after all the discovery that had been done and even after [Nersesian] had absolutely no evidence that [Charles] knowingly participated in any type of a scheme or fraud."

¶ 30    Nersesian's attorney argued that the documents they received from the state listed Charles as a member and manager of NMA, and Charles was added without Nersesian's knowledge. Additionally, Charles's "fingerprints were all over the file. They existed on releases that were prepared. He signed powers of attorney." The attorney continued that on the date he filed the verified complaint, Nersesian knew he was out "a million two," Charles's signature appeared on multiple documents, including indications he was an NMA member, and Michael informed Nersesian that Charles would assist with the LLC. These facts provided a "reasonable basis to determine that Charles had involvement."

¶ 31    The circuit court denied the motion for sanctions on July 7, 2021, stating in relevant part that, "there was information provided to the Secretary of State which *** the Court believes [Nersesian] reasonably relied on." The court continued, "There is a difference *** between the – the discovery between the investigation that is required prior to filing and the investigation that is done as a consequence of discovery and the information that's gathered therefrom."

¶ 32    This appeal followed.

¶ 33                                    ANALYSIS

¶ 34    On appeal, Charles first claims that the circuit court erred by not sanctioning Nersesian under Rule 137 for not making reasonable inquiries before signing and filing his three complaints.

11

¶ 35    Under Rule 137, a party signing a filing must certify in relevant part that "to the best of his knowledge, information, and belief formed after reasonable inquiry" that the allegations made in the complaint are "well grounded in fact and warranted by existing law," and are "not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Ill. S. Ct. R. 137(a) (eff. Jan. 1, 2018). Rule 137 is penal in nature, and we must construe it strictly. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 487 (1998). The rule is not intended to punish litigants who are simply unsuccessful. *Burrows v. Pick*, 306 Ill. App. 3d 1048, 1050 (1999). Whether a complaining party made a sufficient inquiry before filing a complaint is judged by an objective standard. *Whitmer v. Munson*, 335 Ill. App. 3d 501, 514 (2002). The issue turns on what the party knew at the time of filing. *Watkins v. Ingalls Memorial Hospital*, 2018 IL App (1st) 163275, ¶ 82.

¶ 36    We review a circuit court's decision on a motion for sanctions pursuant to Rule 137 for abuse of discretion. *Id.* ¶ 78.[3] "A court has abused its discretion when no reasonable person would agree with its decision." *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 16. "When reviewing a decision on a motion for sanctions, the primary consideration is whether the trial court's decision was informed, based on valid reasoning, and follows logically from the facts." *Technology Innovation Center, Inc. v. Advanced Multiuser Technologies Corporation*, 315 Ill. App. 3d 238, 244 (2000).

---

[3] We note that the court here did not hold an evidentiary hearing on the motions for sanctions. Some courts in this circumstance have suggested that *de novo* review is more appropriate. See *Heckinger v. Welsh*, 339 Ill. App. 3d 189, 191 (2003). In *Heckinger*, however, the court utilized *de novo* review because the circuit court ruled on the sanctions issue as a matter of law, which the court here did not do. *Id.* The majority of reviewing courts have reviewed sanctions orders for abuse of discretion even absent an evidentiary hearing, often citing *Shea, Rogal & Associates, Ltd. v. Leslie Volkswagen, Inc.*, 250 Ill. App. 3d 149, 153-55 (1993). We agree with *Shea* and will review the circuit court's decision here for abuse of discretion.

¶ 37    We find that the circuit court did not abuse its discretion by not sanctioning Nersesian based on unreasonable pre-complaint inquiry. The record shows that Nersesian expected he and Michael would be the NMA members, but Charles, an attorney, would assist, and Michael and Nersesian would evenly split the Keeler Property profit. After the closing, from which Nersesian believed the profits were too low, he procured documents and found Charles listed as an NMA member, and that proceeds from the sale were first used to pay Michael's personal debt obligations. Michael refused to provide additional documents or information about the transaction. A reasonable person in this circumstance could believe Charles assisted Michael in rerouting the Keeler Property sale proceeds away from NMA to first pay Michael's personal debts, and that filing suit and obtaining discovery would provide evidence of this. Additionally, regarding any conduct pre-dating the second amended verified complaint, we must consider that Nersesian did not have the benefit of any deposition testimony or Michael's interrogatory answers. It was not until these were a part of the record that the parties learned Michael forged Charles's name on some of the documents that listed Charles as an NMA member. On this record, we cannot say the court's decision not to sanction Nersesian for his pre-complaint inquiry constituted an abuse of discretion. See *Burrows*, 306 Ill. App. 3d 1048, 1054-55 (no sanctions where "facts and circumstances known to [the claimant] were such that one could reasonably assume that further investigation would uncover supporting proof").

¶ 38    Charles argues that Nersesian's deposition testimony reveals his pre-complaint inquiry was inadequate because he testified he took only three actions—he visited the Krueger Property, investigated its taxes, and requested an accounting of the Keeler Property sale from Michael. This argument is negated by the record; Nersesian attached to the verified complaint multiple

13

documents with Charles's signature indicating he was NMA member, and also the Byline Bank document suggesting Charles's involvement in Michael's debt payments.

¶ 39    Charles also contends that Nersesian's failure to contact either Charles or Coleman before filing the verified complaint constituted unreasonable inquiry. We disagree. If Nersesian had called Charles before filing and Charles denied any involvement, this would not have changed any of the facts known to Nersesian before filing suit regarding Charles's purported signatures on the documents attached to the Verified Complaint. Respecting Coleman, even if she had fully informed Nersesian before he filed of her role with NMA and her understanding of Charles's role at the Keeler Property closing, this too would not have absolved Charles. Coleman testified she believed Charles was a member of NMA and acted accordingly, and offered no insight into Charles's knowledge or intent respecting Michael's allegedly improper conduct.

¶ 40    Charles next argues that Nersesian's allegation in the verified complaint that Charles acted as NMA's attorney was knowingly false, and thus sanctionable. We reject this contention, because the record shows that Nersesian did not know the nature and extent of Charles's NMA involvement until after he filed the verified complaint. Nersesian's deposition shows that, before he filed the verified complaint, he only knew of Charles what Michael told him—that Charles was an attorney, and would assist with NMA. Nersesian then was asked to sign a form authorizing Charles to take actions on behalf of NMA at the Keeler Property closing. This was sufficient information for Nersesian to file a complaint and trigger discovery to learn more regarding Charles's specific role in NMA. *Burrows*, 306 Ill. App. 3d at 1055. After he filed the verified complaint and received the October 30, 2017 email from Charles's attorney, Nersesian removed the claim that Charles acted as NMA's attorney, an act consistent with his Rule 137 duties. See *Stiffle v. Baker Esptein Marz*,

2016 IL App (1st) 150180, ¶ 37 (explaining that a litigant has a duty to promptly dismiss invalid claims).

¶ 41    Similarly, Charles argues that Nersesian had no basis to allege Charles was involved in the Krueger Property transaction. Again, the record suggests otherwise, as Michael informed Nersesian at NMA's outset that Charles would be generally involved, and Nersesian also had evidence that Charles was a signatory to a bank account into which Nersesian deposited the funds for the Krueger Property.

¶ 42    Charles also argues that Nersesian had no basis to allege Charles was a member of NMA because for Charles to become a member, Nersesian himself had to approve the addition. In so arguing, Charles points to Nersesian's request for admission response that Charles was never a member of NMA. We reject this argument, because a reasonable court could have found that it was unclear from the record whether Nersesian knew Charles was not a member of NMA such that the allegation was sanctionable, in light of: (1) the documents Nersesian reviewed pre-suit, (2) Nersesian's testimony that he was not an attorney and did not have a sophisticated understanding of Charles's role, and (3) Nersesian's deposition testimony that he was unsure if he ever authorized Charles to become a member. Additionally, Nersesian changed the allegation to Charles holding himself out as a member, and acting as NMA's agent, as discovery proceeded. This distinguishes this matter from *Pritzker v. Drake Tower Apartments, Inc.*, 283 Ill. App. 3d 587 (1996), cited by Charles. There, the court found sanctions were appropriate because the claimant maintained a factual claim the record showed she knew to be false; here, the record does not show that Nersesian persisted with the allegation that Charles was an NMA member after the discovery process suggested otherwise. See *Pritzker*, 283 Ill. App. 3d at 592-93.

15

¶ 43    Finally, Charles argues that Keeler Property closing documents demonstrate that Nersesian had no basis to claim Charles could be liable for issues with the transaction, specifically arguing that (1) Nersesian signed the corporate resolution authorizing Charles to sign the closing documents, (2) Coleman testified she prepared the documents for Charles to sign, and (3) the documents themselves show Charles was not involved beyond responding to Coleman's request to sign. This argument fails because neither the corporate resolution nor the closing documents were conclusive of Charles's knowledge of Michael's lien situation or if Charles owed a fiduciary duty to Nersesian and/or NMA. While Nersesian authorized Charles to sign closing documents, the record is not clear that Nersesian did so knowing this would involve Charles signing off on paying Michael's debts first from the Keeler Property proceeds, or that Charles was participating in the closing while not owing any fiduciary duty to NMA. A reasonable court could find that given this record, a reasonable person could have believed that discovery would uncover evidence allowing for Charles to be liable for his conduct surrounding the Keeler Property closing, and thus Rule 137 sanctions were not warranted. See *Dowd*, 181 Ill. 2d at 487 (finding sanctions were inappropriate where "evidence exists supporting the plaintiff's claims"). We therefore have no basis to find that the circuit court abused its discretion on this point.

¶ 44    Charles's second claim is that the circuit court erred because it did not consider Nersesian's failure to dismiss meritless claims as a basis for sanctions. Charles also makes arguments regarding the merits of this theory. Nersesian responds that Charles waived any claim based on Nersesian's alleged failure to dismiss meritless claims because Charles did not argue this theory below, and even if Charles had properly preserved the argument, it was meritless.

¶ 45    First, we find Charles sufficiently argued Nersesian's alleged failure to dismiss meritless claims to the circuit court as a ground for sanctions, and thus did not forfeit the argument on appeal.

For a party to preserve an argument for appeal, they must first raise it before the circuit court. See *Huang v. Brenson*, 2014 IL App (1st) 123231, ¶ 22. In his motion for sanctions, Charles argued that Nersesian "continued to morph his allegations with each amended pleading *** without any evidence to support his new claims." Then, at the oral argument, Charles's attorney contended that Nersesian's conduct was still sanctionable even though he ultimately dismissed the case because he forced Charles to defend against clearly meritless claims. Based on this record, we find that Charles sufficiently argued Nersesian's failure to timely dismiss as a ground for sanctions before the circuit court. See *id.* (no forfeiture where issues on appeal are commensurate with those raised before the circuit court).

¶ 46    We next address Charles's argument that the circuit court failed to consider his failure to dismiss theory. A circuit court "is presumed to know the law and apply it properly, absent an affirmative showing to the contrary in the record." *In re N.B.*, 191 Ill. 2d 338, 345 (2000). Under Rule 137, a party who learns his claims are meritless during discovery has a duty to dismiss the claims in a timely fashion, and the failure to do so may constitute grounds for sanctions. See *Stiffle*, 2016 IL App (1st) 150180, ¶ 37.

¶ 47    We find that Charles has failed to rebut the presumption that the circuit court knew and correctly applied the law of Rule 137 in its decision to deny his motion for sanctions. Charles's attorney specifically referenced the facts learned post-discovery, and characterized them as demonstrating Nersesian's claims against Charles were invalid, during proceedings on the motion. We must presume the court considered this argument in light of the law holding that sanctions can be based on a failure to timely dismiss meritless claims. *In re N.B.*, 191 Ill. 2d at 345. We further note that in this context, the law is clear that the circuit court was under no obligation whatsoever to explain its ruling. See *Arnold*, 2015 IL 118110, ¶ 15. The fact the court did not specifically

reference Nersesian's duty to dismiss in explaining its decision is thus of no moment, because the law did not require it do so; instead, it is incumbent upon the challenger, here Charles, to affirmatively demonstrate the court's error. Charles makes no affirmative showing from the record that the court did not know and apply this aspect of the law, and thus his argument fails. *Id.*

¶ 48　Next, to the extent Charles argues that the circuit court considered failure to dismiss as a potential ground to sanction Nersesian, but abused its discretion by not sanctioning Nersesian on this basis, we find that this argument fails as well. At the time Charles moved for summary judgment, Nersesian's claims hinged on Charles's state of mind when he facilitated the Keeler Property closing. Nersesian contended that the fact that Charles actively participated in the Keeler Property closing by signing the documents that made Michael's lien clearances possible permitted the inference that Charles knew of Michael's situation and intended to further it. The circuit court ultimately ruled the evidence did not support this inference, but the argument was not so unreasonable that it is clear Nersesian knew it was false during the litigation, or pursued it for a vexatious or improper purpose. See Ill. S. Ct. R. 137(a) (eff. Jan. 1, 2018); *Burrows*, 306 Ill. App. 3d at 1050.

¶ 49　Charles argues that Nersesian's failure to dismiss the Krueger claims before summary judgment entry is sanctionable. We disagree. Before the discovery process, Nersesian could reasonably believe, based on Charles's behavior regarding the Keeler Property, that Charles was generally involved in NMA's business, which here Nersesian alleged involved misuse of funds intended for the Krueger renovations. Nersesian also knew Charles's name was on the bank account from which the allegedly misused funds were withdrawn. When discovery revealed that Charles never used the account, and there was no additional evidence suggesting his active involvement in the Krueger Property project, Nersesian abandoned the claims. This conduct

followed the requirements of Rule 137. See *Stiffle*, 2016 IL App (1st) 150180, ¶ 37 (attorney has duty to promptly dismiss claims when discovery reveals they are invalid).

¶ 50    Charles next argues that Nersesian should be sanctioned because he did not abandon the allegation that Charles instructed Coleman regarding the Keeler Property closing, despite Coleman's testimony that she provided Charles the documents he signed. We acknowledge Coleman's testimony here was somewhat inconsistent with Nersesian's allegation, but the underlying theory remained valid despite this testimony—while Charles may not have instructed Coleman to prepare the documents, he still executed them, and Coleman confirmed she provided the documents to Charles believing he was an NMA member. Thus, the theory underlying these allegations, that Charles's active role at the Keeler Property closing demonstrated knowledge and intent regarding Michael's conduct, is not impacted by the deposition testimony Charles highlights. Again, that the circuit court ultimately ruled against Nersesian on this point did not render the theory objectively unreasonable to pursue, and thus sanctionable, even in light of Coleman's testimony. See *Id.* ¶ 32 ("party seeking sanctions *** must show that the opposing party made untrue and false allegations without reasonable cause").

¶ 51    Charles also argues that Nersesian's testimony at his deposition demonstrated he knowingly perpetuated invalid claims because he could not reference the specific documents from which he formed the basis of his claims. We disagree because this testimony was irrelevant; no matter whether Nersesian could reference the documents at the time of his deposition, such documents existed, as described extensively above.

¶ 52    Finally, Charles contends that Nersesian's lawyer's argument during the sanctions hearing betrayed the ill intent behind Nersesian's claims. Specifically, the attorney overstated Nersesian's losses and attempted to sensationalize the matter, which Charles argues was emblematic of

Nersesian's overarching strategy of improperly leveraging Charles's reputation to procure a larger return on the lawsuit than Michael alone could provide. As explained above, however, we believe Nersesian had valid bases for pursuing his claims, and that Charles may have suffered a loss of reputation due to the lawsuit does not constitute grounds for sanctions in of itself. See *Dowd*, 181 Ill. 2d at 487. Because Nersesian had a basis for his claims, and Charles points to nothing in the record that demonstrates actual animus or ill intent towards him on Nersesian's part, this argument fails as well. See Ill. S. Ct. R. 137 (eff. Jan 1. 2018) (claim can be sanctionable if brought for "improper purpose, such as to harass or to cause unnecessary delay or needless increase" in costs).

¶ 53                                      CONCLUSION

¶ 54    Nersesian's pre-complaint inquiry was reasonable and provided sufficient grounds to pursue claims against Charles, and the information learned in the discovery process did not so clearly invalidate his claims that Nersesian had a duty to dismiss them. Accordingly, the circuit court did not abuse its discretion by denying Charles's motion for sanctions under Rule 137.

¶ 55    Affirmed.